#25337-a-DG

**2010 SD 24**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KYLA SNELLING,                                    Appellant,

v.

SOUTH DAKOTA DEPARTMENT OF
SOCIAL SERVICES, SOUTH DAKOTA
DEPARTMENT OF HUMAN SERVICES,        Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE KATHLEEN K. CALDWELL
Judge

* * * *

DOMINIC M. SMITH
South Dakota Advocacy Services
Sioux Falls, South Dakota              Attorney for appellant.

MARTY J. JACKLEY
Attorney General

LAURIE M. BAUER
Special Assistant Attorney General
Department of Human Services
Pierre, South Dakota                   Attorneys for appellees.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 11, 2010

OPINION FILED **03/03/10**

#25337

GILBERTSON, Chief Justice

[¶1.] Kyla Snelling (Kyla) appeals the circuit court's decision and order affirming the Administrative Law Judge's (ALJ) determination that Kyla was not eligible for services under a federally funded Medicaid waiver program for in-home/community-based services for the mentally retarded.[1] Kyla also appeals the circuit court's decision affirming the ALJ's denial of reimbursement for a functional evaluation. We affirm.

**FACTS**

[¶2.] Kyla is a sixteen-year-old young woman with Spinal Atrophy Type II, a degenerative muscular disease.[2] Unable to walk or stand, she uses an electric

---

1. The distinction between a mental disability caused by a condition other than "mental retardation" and an individual who is "mentally retarded" is crucial in the federal statutes and regulations at issue in this opinion. For that reason, the term "mentally retarded," as opposed to the more generally accepted terms mentally challenged or mentally handicapped, is used in this opinion.

2. According to the National Institutes of Health, Spinal Muscular Atrophy (SMA) Type II, is a hereditary disease "that cause[s] weakness and wasting of the voluntary muscles in the arms and legs of infants and children." The disorder is

> caused by an abnormal or missing gene known as the survival motor neuron gene (SMN1), which is responsible for the production of a protein essential to motor neurons. Without this protein, lower motor neurons in the spinal cord degenerate and die. . . . Type II (also known as juvenile SMA, intermediate SMA, or chronic SMA, has an onset between 6 and 18 months[)]. Legs tend to be more impaired than arms. Children with Type II are usually able to sit without support if placed in position. Some may be able to stand or walk with help.

(continued . . .)

-1-

#25337

wheelchair. Kyla is unable to use her arms to transfer to and from her wheelchair. She is also unable to bathe, dress her lower body, attend to her personal hygiene needs, use the bathroom, prepare her meals, shop, clean her home, or do any activities of daily living without help. Kyla is physically limited by her ability to lift only small and light objects to and from her lap to a low countertop or table. She has begun experiencing difficulty tipping her head back to drink and uses a straw to compensate. Kyla can feed herself, but requires help cutting solid foods. Her mother, who also cares for two other physically disabled children in the home, provides all of Kyla's care at home and transports her to all her activities. Her mother either uses an electric lift to transfer Kyla, or lifts her manually. Kyla's mother is the sole caregiver except while Kyla is at school.

[¶3.] Kyla has an IQ of 109, well within the normal range, and attends public high school in Sioux Falls with the help of an educational assistant. A Hoyer lift is used to transfer Kyla at school. Kyla is considered bright, social, and able to comport herself in school without any behavioral issues. Kyla is currently working on obtaining a driver's license; although she will require an adapted automobile after she is licensed to drive.

[¶4.] Kyla receives Supplemental Social Security Income (SSI) and services from a non-waiver family support program administered by the Department of Social Services (DSS) through Volunteers of America and funded exclusively with

---

(. . . continued)
    National Institutes of Health, National Institute of Neurological Disorders
    and Stroke, http://www.ninds.nih.gov/disorders/sma/sma.htm (last visited
    February 22, 2010).

general state funds. The state-funded, non-waiver program is codified at SDCL

chapter 27B-2. Services through the state-funded non-waiver program are limited

to individuals with a developmental disability as defined at SDCL 27B-1-18, which

provides:

> A developmental disability is any severe, chronic disability of a person that:
>
> (1) Is attributable to a mental or *physical impairment* or combination of mental and physical impairments;
>
> (2) Is manifested before the person attains age twenty-two;
>
> (3) Is likely to continue indefinitely;
>
> (4) Results in substantial functional limitations in three or more of the following areas of major life activity: self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency; and
>
> (5) Reflects the person's need for an array of generic services, met through a system of individualized planning and supports over an extended time, including those of a life-long duration.

(Emphasis added).

[¶5.] A second family support program managed by DSS, administered

through a Medicaid waiver and funded with federal funds (Medicaid FS Waiver

program), is available to qualified South Dakota residents. The Medicaid FS

Waiver program is limited to individuals in need of and eligible for institutionalized

services in an Intermediate Care Facility for People with Mental Retardation

(ICF/MR) as provided by 42 CFR § 440.150, but who could remain in their homes or

in the community if services were available.

#25337

[¶6.]     The Code of Federal Regulations, Chapter 42, Section 440.150,

contains the eligibility requirements for services and institutionalization in an

ICF/MR, which also determine whether an individual may also qualify for the

Medicaid FS Waiver program.  It provides:

> (a) "ICF/MR services" means those items and services furnished
> in an intermediate care facility for the mentally retarded if the
> following conditions are met:
>
> (1) The facility fully meets the requirements for a State license
> to provide services that are above the level of room and board.
>
> (2) The primary purpose of the ICF/MR is to furnish health or
> rehabilitative services to persons with mental retardation or
> persons with related conditions.
>
> (3) The ICF/MR meets the standards specified in subpart I of
> part 483 of this chapter.
>
> (4) The recipient with mental retardation for whom payment is
> requested is receiving active treatment, as specified in § 483.440
> of this chapter.
>
> (5) The ICF/MR has been certified to meet the requirements of
> subpart C of part 442 of this chapter, as evidenced by a valid
> agreement between the Medicaid agency and the facility for
> furnishing ICF/MR services and making payments for these
> services under the plan.

42 CFR § 440.150.  The Medicaid FS Waiver program's objective is to avoid placing

a qualified individual in an ICF/MR if necessary services are available in the

community.  *See* 42 USC § 1396a(a)(10)(A)(ii)(VI); 42 CFR § 441.301(b)(1)(ii) and

(iii)(B); 42 CFR § 430.25(c)(2).  An individual qualifies for placement in an ICF/MR

under 42 CFR § 435.1010, which defines "Persons with related conditions" as

follows:

Persons with related conditions mean individuals who have a severe, chronic disability that meets all of the following conditions:

(a) It is attributable to--

(1) Cerebral palsy or epilepsy; or

(2) Any other condition, other than mental illness, *found to be closely related to mental retardation* because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons.

(b) It is manifested before the person reaches age 22.

(c) It is likely to continue indefinitely.

(d) It results in substantial functional limitations in three or more of the following areas of major life activity:

(1) Self-care.

(2) Understanding and use of language.

(3) Learning.

(4) Mobility.

(5) Self-direction.

(6) Capacity for independent living.

(Emphasis added).

[¶7.] South Dakota currently maintains one ICF/MR in Redfield, South Dakota. Services focus on the individual needs of each resident in the areas of "personal care, social interaction skills, behavioral impulse control, making appropriate choices, domestic skills, etc. Depending upon the person, techniques may be utilized to enhance sensory motor skills, responses to stimuli, orientation to

#25337

one's environment, etc. Vocational and educational training are also offered." S.D. Dep't of Human Services, http://dhs.sd.gov/sddc/about.aspx (last visited February 22, 2010).

[¶8.] The Centers for Medicaid and Medicare approved South Dakota's participation in the Medicaid FS Waiver program for home and community based services (HCBS). South Dakota Administrative Rules provide the qualifications for participation in the Medicaid FS Waiver program and mirror the federal requirements. An individual seeking to participate in the Medicaid FS Waiver program must meet the requirements of ARSD 67:54:04:04, which provides:

> In addition to qualifying under § 67:54:04:03, an individual must meet the following requirements:
>
> (1) Be developmentally disabled according to § 67:54:04:05;
>
> (2) Be appropriate for HCBS placement according to § 67:54:04:06; and
>
> (3) Be in need of and eligible for placement in an intermediate care facility for the mentally retarded or the developmentally disabled according to § 67:54:03:04.
>
> An individual who has been denied social security or SSI disability benefits based on a disability is ineligible for HCBS.

An individual may be eligible for the program if that person meets the requirements of ARSD 67:54:04:04, and the requirements of ARSD 67:54:04:03, which provides:

> HCBS may be available to an individual who meets one of the following requirements:
>
> (1) Is receiving AFDC, SSI, or a foster care maintenance payment under Title IV-E of the Social Security Act; or
>
> (2) Is aged, blind, or disabled and has an income less than 300 percent of the SSI standard benefit but is not eligible for SSI.

#25337

The individual must also satisfy the requirements of ARSD 67:54:04:05, which

provides:

> The provider shall maintain documentation signed by a physician or psychologist which indicates that the individual is developmentally disabled. An individual is considered developmentally disabled if the individual *meets all of the following criteria*:
>
> (1) The individual has a severe, chronic disability attributable to mental retardation, cerebral palsy, epilepsy, head injury, brain disease, or autism or any other condition, other than mental illness, *closely related to mental retardation and requires treatment or services similar to those required for the mentally retarded.* To be closely related to mental retardation, a condition must cause impairment of general intellectual functioning or adaptive behavior similar to that of mental retardation;
>
> (2) The disability manifested itself before the individual reached age 22; and
>
> (3) The disability is likely to continue indefinitely.

(Emphasis added). Finally, an individual qualified by virtue of having a

developmental disability as defined by ARSD 67:54:04:05 must need the types of

services offered in an ICF-MR by demonstrating a "substantial functional

limitation" in three or more of the functional areas listing in ARSD 67:54:03:04:

> (1) Self-care—the daily activities enabling a person to meet basic life needs for food, hygiene, and appearance;
>
> (2) Receptive and expressive language—communication involving verbal and nonverbal behavior that enables a person to understand others and to express ideas and information to others;
>
> (3) Learning/general cognitive competence—the ability to acquire new behaviors, perceptions, and information and to apply the experiences to new situations;

(4) Mobility—the ability to use fine or gross motor skills to move from one place to another with or without mechanical aids;

(5) Self-direction—the management of one's social and personal life; the ability to make decisions affecting and protecting one's self-interests;

(6) Capacity for independent living—based on age, the ability to live without extraordinary assistance; and

(7) Economic self-sufficiency—the maintenance of financial support.

[¶9.] On December 10, 2007, Kyla submitted her Medicaid FS Waiver program application. DSS initially determined she was financially eligible for the program under ARSD 67:54:04:03 due to her receipt of SSI. On January 22, 2008, her application was submitted to the Division of Developmental Disabilities for further review by the Utilization Review Team (URT) because Kyla's IQ exceeded seventy (70), the threshold for mental retardation or developmental deficiency. The URT met and determined Kyla was not eligible for the program because she did not meet the definition of "Persons with related conditions" in 42 CFR § 435.1010, in that she was neither mentally retarded nor did she have a "related condition" within the meaning of subsection (a)(2) as defined. It further determined that she was not appropriate for placement at Redfield because she was not in need of the same services as that facility's population due to her normal intellectual abilities. Kyla's application was denied by DSS.

[¶10.] Kyla appealed the denial to an ALJ. Prior to the hearing before the ALJ, a functional evaluation was performed by Joan Mutchler, who had worked as Kyla's occupational therapist since Kyla was three years old. That evaluation found Kyla met four of the seven functional areas listed in ARSD 67:54:03:04. The

functional evaluation was performed without prior approval from DSS, Division of Developmental Disabilities.

[¶11.] On September 10, 2008, after a hearing on the matter, the ALJ issued a Notice of Pending Decision and Pending Decision affirming DSS's denial of Kyla's application. Kyla timely filed objections and a supporting brief. The ALJ then issued its final decision denying Kyla's request. The ALJ also denied payment for Mutchler's functional evaluation because prior approval for payment was not sought by Kyla and the evaluation was not necessary to determine whether Kyla was eligible for the program. The circuit court affirmed the ALJ's decision.

[¶12.] Kyla appeals to this Court raising the following two issues:

1. Whether the circuit court erred in affirming the ALJ's decision that Kyla was ineligible for the Medicaid FS Waiver program.

2. Whether the circuit court erred in affirming the ALJ's denial of reimbursement for the functional evaluation.

## STANDARD OF REVIEW

[¶13.] A review of an administrative agency's decision requires this Court to "give great weight to the findings made and inferences drawn by an agency on questions of fact." Tebben v. Gil Haugen Constr., Inc., 2007 SD 18, ¶15, 729 NW2d 166, 171. Only when an agency's decision is "clearly erroneous in light of the entire evidence in the record" we will reverse on appeal. *Id.* (citing Wells v. Howe Heating & Plumbing, Inc., 2004 SD 37, ¶9, 677 NW2d 586, 590) (quoting SDCL 1-26-36)). We examine de novo all questions of law, as well as documentary evidence contained in the record. *Id.* Statutory interpretation is also a question of law

reviewed under the de novo standard. *Discover Bank v. Stanley*, 2008 SD 111, ¶15, 757 NW2d 756, 761.

DECISION AND ANALYSIS

[¶14.]       **1.       Whether the circuit court erred in affirming the ALJ's decision that Kyla was ineligible for the Medicaid FS Waiver program.**

[¶15.]       The circuit court found that because Spinal Atrophy Type II was strictly a physical disability without any mental retarding effect, Kyla was ineligible for the Medicaid FS Waiver program despite having substantial functional limitations in four of the seven categories listed in 42 CFR § 435.1010. It further found that because Kyla lacked a diagnosis that qualified as "a severe, chronic disability attributable to mental retardation, cerebral palsy, epilepsy, head injury, brain disease, or autism or any other condition, other than mental illness, closely related to mental retardation," as defined in ARSD 67:54:04:05 and 42 CFR § 435.1010 "Persons with related conditions," DSS did not need to consider Kyla's functional limitations to determine her eligibility.

[¶16.]       Kyla argues she qualifies for the waiver because her condition causes impairment of adaptive behaviors similar to the deficits of the mentally handicapped population. She argues her need for assistance with almost all activities of daily living renders her at risk for institutionalization if her mother's care is no longer available. Kyla further argues she is qualified for the Medicaid FS Waiver program because she has four of the seven substantial functional limitations as listed in ARSD 67:54:03:04 and 42 CFR § 435.1010 "Persons with related conditions" (d)(1)-(7). She also argues that the holding in *Pacheco v. R.I. Dep't of*

-10-

*Mental Health, Retardation and Hosps*, 1996 WL 936911 (RISuper), supports expanding the eligibility for the Medicaid FS Waiver program beyond the diagnostic approach of using the categories of mental retardation, cerebral palsy, autism, epilepsy or other conditions closely related to mental retardation. DSS argues the language of ARSD 67:54:04:05(1) and 42 CFR § 435.1010 "Persons with related conditions" (a)(1)-(2) requires that an individual first meet the diagnostic requirements before it may consider any functional limitation.

[¶17.]    As we have previously stated:

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed.

*Discover Bank*, 2008 SD 111, ¶15, 757 NW2d at 761.

[¶18.]    A plain reading of the language in ARSD 67:54:04:05(1) and 42 CFR § 435.1010 "Persons with related conditions" (a)(1)-(2) shows that an applicant must meet the diagnostic requirement of having "a severe, chronic disability attributable to mental retardation, cerebral palsy, epilepsy, head injury, brain disease, or autism or any other condition, other than mental illness, closely related to mental retardation," before any consideration is given to the applicant's functional limitations. The condition must also result in "impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons." ARSD 67:54:04:05(1); 42 CFR § 435.1010 "Persons with related conditions" (a)(1)-

(2). The diagnostic condition and resulting impairments must make placement in an ICF/MR appropriate. ARSD 67:54:04:05(1); 42 CFR § 435.1010 "Persons with related conditions" (a)(1)-(2).

[¶19.] An applicant must meet *all* the requirements in 42 CFR § 435.1010 "Persons with related conditions" subsections (a) through (d) to qualify for the program as evidenced by the lack of the disjunctive word "or" between the four subsections. The same language and lack of a disjunctive connector exists between subsections (1) through (3) in ARSD 67:54:04:05, which shows an individual must first qualify as mentally retarded, or as having a condition closely related to mental retardation, before any consideration is given to functional limitations.

[¶20.] The URT determined that Kyla was not an appropriate candidate for placement at Redfield due to her intellectual functional capacity and IQ in the normal range. The URT acknowledged that Kyla's Spinal Muscular Atrophy Type II made her unable to provide for her own care, limited her mobility and self-direction, and capacity for independent living. However, the disease did not do so by harming or retarding her intellect. Based on the record developed before the ALJ, the circuit court found Kyla was able to determine her physical needs and how best to care for them by applying her intellect and reasoning skills, unlike a mentally retarded person. It also found Kyla was able to direct others on how to best provide for her physical needs without the programming and services available at Redfield, including social interaction skills, behavioral impulse control, enhancement of sensory motor skills, responses to stimuli, and orientation to environment. Based on the determination that Kyla was not appropriate for

placement in South Dakota's only ICR/MR institution, she was found ineligible for the Medicaid FS Waiver program because she was not at risk for institutionalization at that facility. We can find no error in the findings of fact regarding the lack of any connection between Kyla's physical limitations and mental retardation or a closely related condition.

[¶21.]     Kyla's reliance on *Pacheco* is misplaced. In that unpublished opinion, the Superior Court of Rhode Island held that Rhode Island's state-funded non-waiver program was available to Pacheco despite the lack of a diagnosis of mental retardation. 1996 WL 936911, at *5. It did so after determining that the state-funded non-waiver program applied equally to mentally retarded individuals and non-mentally retarded individuals with chronic disabilities. *Id.* (holding Pacheco was ultimately ineligible because although he was developmentally disabled, he did not meet the requirement of having at least three functional limitations required by the relevant statute). That case dealt with a program similar to the state-funded non-waiver program codified at SDCL chapter 27B-2, for which Kyla was already receiving benefits and was not at issue in this appeal. *See* RI Gen Laws § 40.1-21-4.3 (defining "developmentally disabled adults to include both mentally retarded individuals and those with a severe chronic mental or physical disability"); § 40.1-21-10 (codifying state appropriations for services for developmentally disabled adults).

[¶22.]     The circuit court did not err when it upheld the ALJ's determination that Kyla was not qualified for the Medicaid FS Waiver program because she failed to meet the first qualification in that she was not mentally retarded nor did she

have a condition closely related to mental retardation. While Kyla's physical limitations are similar to those of some individuals with qualifying medical conditions, Kyla's cognitive abilities and IQ place her beyond the population for which the Medicaid FS Waiver program was intended as she is not appropriate for institutionalization at the Redfield program.[3]

[¶23.]    **2.    Whether the circuit court erred in affirming the ALJ's denial of reimbursement for the functional evaluation.**

[¶24.]    The ALJ found Mutchler did not have a Medicaid provider agreement and that the South Dakota medical assistance program was authorized to make payments only to providers with such an agreement with DSS. It also found Mutchler's evaluation was not necessary to determine whether Kyla was qualified for the program under ARSD 67:54:04:05 because she was neither mentally retarded nor did she have a condition closely related to mental retardation. The ALJ denied payment. The circuit court affirmed the ALJ's decision.

[¶25.]    Kyla argues the functional evaluation performed by Mutchler prior to the hearing before the ALJ was necessary to her case, and therefore the circuit court erred when it upheld the ALJ's denial of payment. DSS argues that because Kyla did not meet the first criteria under the program, she was neither mentally

---

3.    Kyla's argument that she is at risk for institutionalization if her mother's care is no longer available is valid. However, the type of placement appropriate for Kyla would not be at Redfield according to members of the URT. Kyla appears to be more appropriate for placement in a nursing home, or community-based facility for individuals with spinal cord injuries rather than a facility for the mentally retarded.

retarded nor did she have a condition closely related to mental retardation, the functional evaluation was not necessary. DSS further argues Kyla's failure to obtain prior payment approval also supports denying reimbursement.

[¶26.]     ARSD 67:17:02:23 (2007) (repealed 25 SDR 166, effective December 24, 2008), provided:

> When a hearing involves medical issues, a medical assessment by a general practitioner or a specialist in the area of the alleged disability or incapacity other than that of the person involved in making the original medical examination shall be authorized if the hearing examiner considers it necessary and shall be made part of the record. If the additional medical assessment recommends referral for additional examination or testing, it shall be authorized and paid for by DSS.

The ALJ determined the evaluation was not necessary to determine whether Kyla was qualified for the program. It also determined the assessment was not preauthorized as required. Given our holding in Issue 1, Mutchler's evaluation was not necessary to determine Kyla's eligibility. Failure to obtain preapproval from DSS for an unnecessary evaluation is fatal to this issue on appeal.

[¶27.]     Affirmed.

[¶28.]     KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.