#26350-a-SLZ

**2013 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MICKEY NELSON,                                      Appellant,

    v.

SOUTH DAKOTA DEPARTMENT
OF SOCIAL SERVICES, SOUTH DAKOTA
DEPARTMENT OF HUMAN SERVICES,          Appellees.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STUART L. TIEDE
Judge

* * * *

ELIZABETH OVERMOE of
South Dakota Advocacy Services
Sioux Falls, South Dakota                    Attorneys for appellant.


MARTY JACKLEY
Attorney General

CHRIS MCCLURE
Special Assistant Attorney General
Pierre, South Dakota                         Attorneys for appellees.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 8, 2013

OPINION FILED **02/13/13**

#26350

ZINTER, Justice

[¶1.] The South Dakota Department of Human Services (the Department) denied Mickey Nelson's application for Home and Community Based Services (HCBS), a federal-state Medicaid Waiver program that provides assistance to individuals with developmental disabilities.[1] After a hearing, an administrative law judge affirmed the Department's denial. Nelson appealed to circuit court, which also affirmed the Department's denial. We affirm.

*Facts and Procedural History*

[¶2.] Mickey Nelson is a 48-year-old who lives without institutional care in Sioux Falls. Nelson has "borderline intellectual functioning," having a performance IQ of 97, a verbal IQ of 73, and a full scale IQ of 82.[2] He also has an expressive language disorder and a learning disorder. Because his IQs are over 70, Nelson is not considered "mentally retarded."[3]

[¶3.] Nelson attended school through the ninth grade and then received employment training from South Dakota Achieve. South Dakota Achieve is a non-profit organization that assists individuals with intellectual and developmental

---

1. HCBS applications are submitted to the Department of Human Services. The Department of Human Services administers the HCBS program, but the program is a part of the Department of Social Services' Medical Assistance program. Therefore, both departments are named in this appeal.

2. Dr. Ted Williams testified that when there is a significant difference between an individual's performance IQ and verbal IQ, it is standard practice to use the higher IQ. Dr. Williams also testified that the mean IQ of the general population is 100.

3. We use the phrase "mentally retarded" because that is the language used in South Dakota's administrative rules. *See, e.g.*, ARSD 67:54:04:05(1).

disabilities. Nelson was employed at a restaurant for fourteen years, and then worked at a Pizza Hut for ten years. His job at Pizza Hut was eliminated in 2009 because of economic conditions. He had not become reemployed at the time of hearing. In September 2010, Nelson began receiving Social Security disability benefits.

[¶4.] Nelson met his wife while they were both clients of South Dakota Achieve. They have been married for over twenty years and have lived in their current apartment throughout the marriage.

[¶5.] Nelson's wife was receiving HCBS through South Dakota Achieve for her individual needs and areas in which she shared joint responsibility with Nelson. Nelson, however, could not receive HCBS for his individual needs unless he also qualified. In September 2010, Nelson submitted an HCBS application to the Department's Division of Developmental Disabilities (the Division).

[¶6.] Two reports were submitted with Nelson's application. The first was an Inventory for Client and Agency Planning (ICAP),[4] which was completed by Melanie DeBates, the admissions director for South Dakota Achieve. The second report was a psychological evaluation completed by Dr. Elwin Unruh. After considering Dr. Unruh's evaluation and Nelson's ICAP, the Department made a preliminary determination that Nelson was ineligible for HCBS. However, the Department asked the Division's eligibility review team to consider Nelson's

---

4.  ARSD 67:54:04:06 requires completion of an ICAP before HCBS may be approved. *See also* ARSD 67:54:04:04(2). An ICAP measures an individual's abilities in self-care, language, learning/cognition, mobility, self-direction, independent living, and economic self-sufficiency. *See* ARSD 67:54:04:06.

application and assess his adaptive behaviors. Nelson's adaptive behaviors were evaluated using a "Vineland II" assessment completed by DeBates.[5] After reviewing the psychological evaluation, the ICAP, and the Vineland II assessment, the eligibility review team agreed with the Department's conclusion that Nelson was ineligible for HCBS.

[¶7.]     Nelson requested administrative review. Darryl Millner, the Department's HCBS program manager, and Dr. Ted Williams, a member of the Division's eligibility review team, testified on behalf of the Department. Two employees of South Dakota Achieve testified for Nelson. DeBates testified that Nelson's ICAP showed he had "weaknesses in all the areas of social and communication[,] personal living and community living skills." DeBates testified that, based on the Vineland II assessment, Nelson "demonstrate[d] deficits in all areas of communication, daily living, socialization, and motor skills." Tammy Nolle, a supportive living worker who provided HCBS to Nelson's wife, testified to the Nelsons' living situation. Nolle indicated that Nelson had difficulty completing household chores and was struggling to live independently. Nolle also testified that Nelson had health and nutrition issues.

[¶8.]     After considering the testimony, the ICAP, the Vineland II assessment, and Dr. Unruh's psychological evaluation, the administrative law judge affirmed the Department's denial of benefits. The administrative law judge found that

---

5.    The Vineland II assessment measures an individual's adaptive behaviors in the following categories: communication, daily living, social skills and relationships, physical activity, and problem behaviors. The assessment is based on a parent's or proposed caregiver's rating of the individual's behaviors in each category.

"Nelson has been employed, married, and living independently for two decades, he has not shown that this condition has changed, . . . and he is not eligible for [HCBS]." The circuit court affirmed.[6]

*Decision*

[¶9.] The Medicaid HCBS Waiver program is a federally-funded program that "is limited to individuals in need of and eligible for institutionalized services in an Intermediate Care Facility for People with Mental Retardation (ICF/MR) . . . , but who could remain in their homes or in the community if services were available." *See Snelling v. S.D. Dep't of Soc. Servs.*, 2010 S.D. 24, ¶ 5, 780 N.W.2d 472, 474-75. *See also Weisenborn ex rel. Shoemaker v. Mo. Dep't of Mental Health*, 332 S.W.3d 288, 294 (Mo. Ct. App. 2011) (quoting *Hyde v. Dep't of Mental Health*, 200 S.W.3d 73, 74 (Mo. Ct. App. 2006)) ("The Medicaid Waiver program is one through which individuals 'receive services funded by the federal program normally available only at an institution.'"). The federal eligibility requirements for "services and institutionalization in an ICF/MR . . . determine whether an individual may also qualify for the Medicaid [ ] Waiver program." *Snelling,* 2010 S.D. 24, ¶ 6, 780 N.W.2d at 475. If an applicant is qualified, the program "permits [s]tates to offer . .

---

6.    The circuit court affirmed for a different reason. The court concluded that Nelson was not eligible because he was not mentally retarded and did not have a condition closely related to mental retardation. *See* ARSD 67:54:04:04(1); 67:54:04:05(1). We do not address the court's reasoning because we conclude that the administrative law judge's reasoning is dispositive. *See Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 357 (S.D. 1992) ("When an appeal of an administrative agency's decision in a contested matter is taken to circuit court and the final judgment of that court is appealed to this court, we must make the same review of the agency's actions as did the circuit court.").

. an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300.

[¶10.]    To be eligible for South Dakota's HCBS, an individual must satisfy ARSD 67:54:04:04, which has three requirements:

> In addition to [financial eligibility], an individual must meet the following requirements:
>
> (1)    Be developmentally disabled according to § 67:54:04:05;
> (2)    Be appropriate for HCBS placement according to § 67:54:04:06; and
> (3)    Be in need of and eligible for placement in an intermediate care facility for the mentally retarded or the developmentally disabled according to § 67:54:03:04. . . .[7]

[¶11.]    To satisfy subsection (1), Nelson must have been "developmentally disabled according to [ARSD] 67:54:04:05[.]" *See* ARSD 67:54:04:04(1). To be

---

7.    Nelson argues that his ICAP, revealing the requisite limitations, conclusively establishes that he is eligible for placement in an ICF/MR. *See* ARSD 67:54:04:04(3); 67:54:03:04. Although Nelson's ICAP indicated that he had the limitations necessary to satisfy ARSD 67:54:04:04(3), Nelson overlooks the requirement of ARSD 67:54:04:04(1), which incorporates ARSD 67:54:04:05. ARSD 67:54:04:05(1) provides that an individual must require "treatment or services similar to those required for the mentally retarded." *See also* ARSD 67:54:03:02(2)-(3) and 67:54:03:03(1) (indicating that, to be eligible for ICF/MR placement, an individual must satisfy both the requisite number of ICAP limitations and require "treatment or services similar to those required for the mentally retarded"). This additional requirement is consistent with 42 C.F.R. § 435.1010 (defining "[p]ersons with related conditions" as a person who "requires treatment or services similar to those required for [the mentally retarded]" *and* shows "substantial functional limitations in three or more . . . areas of major life activity"). The areas of major life activity identified in 42 C.F.R. § 435.1010 are nearly identical to the areas identified in South Dakota's ICAP requirement. *See* ARSD 67:54:03:04.

considered developmentally disabled, Nelson must, among other things, "require[ ] treatment or services similar to those required for the mentally retarded." ARSD 67:54:04:05. The South Dakota rules do not define the treatments or services that are similar to those required by the mentally retarded. However, the federal rules describe the treatment and services required by individuals in an intermediate care facility for the mentally retarded. *See* 42 C.F.R. § 483.440(a)-(b)(1). The federal rules require "active treatment," which must be an aggressive program of "specialized and generic training, treatment, health services and related services[.]"[8] *See* 42 C.F.R. § 483.440(a)(1). But, "[a]ctive treatment does not include services to maintain generally independent clients who are able to function with little supervision or in the absence of a continuous active treatment program." 42 C.F.R. § 483.440(a)(2).

[¶12.]     Nelson argues that he has not been generally independent. Nelson points out that, although he has lived on his own for over twenty years, he is receiving some HCBS services through his wife's service provider. Nelson also points out that after his last employment, he was deemed eligible for Social Security

---

8.     Active treatment includes the:

> (1)     . . . aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services . . . that is directed toward--
> (i)     The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and
> (ii)     The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a)(1).

disability benefits. Nelson argues that he is "no longer able to be employed at a productive wage level without long-term supervision or support."[9] Nelson also argues that the administrative law judge failed to account for the testimony of Melanie DeBates and Tamara Nolle, who identified Nelson's deficits and struggles with living independently.

[¶13.]    On the other hand, Dr. Unruh's psychological evaluation indicated that Nelson had been living independently. Cognitively, Nelson was not diagnosed as mentally retarded. He was found to be "lower average to below average . . . with average performance scores." Additionally, with early training, Nelson had a lengthy employment history. Dr. Unruh indicated that Nelson had hobbies including watching football, watching movies, and shopping with his wife. Nelson also owned a vehicle and drove independently. Dr. Unruh concluded that Nelson could manage his personal affairs and function independently:

> [Nelson] presents as an individual who is able to maintain [a] relatively appropriate understanding of choices that are available to him within his level of functioning. He indicates being capable of managing his own personal affairs and finances, and generally has been able to function without any significant social dysfunction. He perhaps lacks to some degree in understanding fully what choices he might have to improve his interaction with peers or fellow employees, but as he was able to maintain employment for over fourteen years in his employment record, he apparently has learned to work through some of these difficulties as well. Viewing his overall presentation, he appears capable of managing his own benefits at this time.

[¶14.]    In weighing the conflicting evidence, the administrative law judge found that Nelson was ambulatory and able to drive. The administrative law judge

---

9.    Nelson introduced no expert testimony to support this assertion.

also found that Nelson had lived in the same apartment for over twenty years, he had been employed for a total of twenty-four years, and he was able to maintain employment. The administrative law judge further found that Nelson was "motivated to find work and maintain his independence." The administrative law judge ultimately found that "Nelson has been employed, married, and living independently for two decades [and] he has not shown that this condition has changed . . . ."

[¶15.]    In reviewing these findings of fact, we do not reverse merely because there is conflicting evidence, and we do not "substitute our judgment for that of the [agency fact finder], unless we are left with a definite and firm conviction a mistake has been made." *Abild v. Gateway 2000, Inc.*, 1996 S.D. 50, ¶ 11, 547 N.W.2d 556, 559. Here, there was evidence supporting the finding that Nelson had lived independently for two decades and that his situation had not changed. This evidence indicated that Nelson was "a generally independent client[ ] who [was] able to function with little supervision or in the absence of a continuous active treatment program." *See* 42 C.F.R. § 483.440(a)(2). We conclude that the administrative law judge did not clearly err in finding that Nelson did not qualify for benefits.

[¶16.]    GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.